And our next case for argument is Dodge v. Evergreen School District Do you know the guy from Portland? All right, one housekeeping matter. My understanding is that Mr. McFarland and Ms. Pierce are splitting time? Yes All right, and so the clock will reflect the time that you have agreed to for splitting   All right, thank you. Go ahead. I warn your honors, Gary Menke for appellant Eric Dodd. Before I start I just wanted to be sure that the audio was clear enough. Can you hear me okay? I think you're good. Yeah, okay. May it please the court. The First Amendment protects a diversity of viewpoints, especially about politics, even when the listeners disagree with that viewpoint. We ask this court to reverse the summary judgment of the district court, which granted qualified immunity to the individual defendants here, and also dismiss my client's Monel retaliation claim against the school district. So turning first to the qualified immunity of Principal Garrett, we think the cases show that there are two paths for this court to determine whether a constitutional right is clearly established enough to support denial of qualified immunity. Under one path, we believe the court clearly defines the contours of the right specifically enough and circumstances similar enough to the case that any reasonable official would be on notice that their conduct would violate the Constitution. And the second path, as set out in several of this court's precedents, including Judge Hawkins' opinions for the panel in Eng v. Cooley, in Brewer and others, is that where the Pickering balancing test so clearly favors the employee's right to free speech, that any reasonable official would understand that that interest supersedes whatever interest the government may assert. And that latter approach to qualified immunity, we think, is consistent with the directives of the Supreme Court, which have acknowledged that even in fact-specific excessive force claims, there may be instances where the case is so obvious that any reasonable official would know that their conduct was violating the Constitution. So I think that our case law is not necessarily consistent on this issue regarding whether something is clearly established. Because we have Brewster that says basically that Pickering is so fact-specific that you're just almost never going to find a case where it's going to have been clearly established, unless you can find a case with the exact same facts. And certainly we don't have that. So Mike, that's a long lead-in to a question of, do you have to rely on a principle that this is an obvious case to get past qualified immunity? We think we succeed on both approaches, Your Honor. So to take the approach, like if you'd like me to address, you know, if the panel concludes that it needs to find a specific case, it can provide some cases. And I think defining the contours of the right as saying that an official can't act out of protectual animus toward the content of that speech. I so dislike the viewpoint that you have expressed that my actual reason for acting against you is my animus and dislike, rather than the effects that the speech has created. We believe that that principle is clearly established under case law, including cases like Judge Hawkins' opinion for the panel in Robinson v. York, Eng v. Cooley, Nunez v. Davis, McKinley. And I think that that specifically defines the right well enough that any official would understand, if I have animus, I cannot restrict this person's speech. I would differentiate that level of generality, which I think is fine in the animus context, with say where you have an excessive force claim, where police officers can use force constitutionally. And so the question is... What is the animus here? What is the animus here? Well, the animus here we think is a question of fact, and that viewing all the evidence in the light most favorable to... What is it? We think that the evidence shows that Principal Garrett, she was stridently anti-Trump. She admitted that in her deposition. She was overheard by another teacher saying that she was anti-Trump. She posted Twitter messages showing Mr. Trump and compared him to a Nazi. She's the one with the Bernie Sanders bumper sticker? This is... She had a Bernie Sanders bumper sticker. She permitted a Black Lives Matter poster to be up in the library. And then when another teacher complained and said, listen, my husband's a police officer, I don't feel comfortable with that. She, being Principal Garrett, shut that other teacher down. She also said... Here's my question. Okay. And there are many other facts listed. Could I ask something before we get to qualified immunity? What was the adverse employment action? We think that... So if we apply this circuit's test of was what happened reasonably likely to deter speech, that the facts, when viewed in the light most favorable to my client, meet that test. I couldn't find a case where... It seemed like when you got to something that was threatening, it wasn't... They all seemed to have something a little more than this. One was in prison. There were other more substantial, quote, threats. This was, you bring your rep and I'll bring mine. And I couldn't really find a case that was that minimal. What have you got for me there? I would say, Judge, well, first of all, just analytically, this is a question of fact for the jury. Also, the police haven't argued that this is a question where qualified immunity analysis applies. They're not claiming qualified immunity on the adverse action basis, at least from the way I read their briefs. And so this court need not find a specific case on all fours because qualified immunity isn't really here. We think the question is just one of fact. Is this a matter for the jury or not? The board did take action against Garrett, didn't it? That's correct. Privately, which we think is a fact that bears on Monell ratification analysis. And we also think shows that. What can we draw from that in terms of a neutral view of this case? You had the incident involving the wearing of the hat. On the second time, your client wore it just in the parking lot because of the sun on his head, which I can sympathize with. But at the end of the day, what the school board did was say, Garrett, you were in the wrong. Well, Your Honor, I think she it did and it didn't. Publicly, it said she did nothing in violation of any district policy. We don't think that that's correct under the civility didn't give her a star for her forehead. So they didn't. They didn't. My client didn't know about the private discipline until discovery began and he filed this lawsuit. How does that impact our digging into the question? Judge Rossani asked you about adverse action. The fact that the school board did so privately or that it reprimanded Principal Garrett or both that the board took a look at what happened. And never concluded that your client was in the wrong, but did conclude that Garrett deserved some adverse action. Correct? That's right. I mean, we think that it supports our case because of a letter of reprimand to use the military, a letter, a letter reprimand, and she subsequently resigned. And we think it supports it in a couple of ways. The fact that the board believed that the Principal Garrett had been dishonest with the board throughout the investigation further supports the animus that Principal Garrett had with respect to adverse employment action. The fact that the board said publicly to Mr. Dodge, didn't say anything to him until he filed this lawsuit and conducted discovery. Ms. Garrett did nothing against policy. In other words, she, we're not, we're not saying she can't do that, even though there's a civility policy in place that says you can't use vulgar words, which she did. Answer the question. In a sentence, what is the adverse action vis-a-vis your client? So we do think that this court's decision, I think it's pronounced co-salter, backs away from an earlier decision in Nunez v. Los Angeles, and said that harsh words for a sentence that begins with the adverse action consisted of fill in the blank. Yeah. Her Principal Garrett's very harsh words towards him using vulgarity, saying, I never want to see that again. And if you do so, you need to have your union. So that was a threat of investigation and discipline. That's it. I would say also the subsequent investigation and conclusions and saying that the public action and saying Principal Garrett did nothing wrong here. Principal Garrett didn't reverse herself. Ms. Gomez didn't step in and say we have a problem here. So that sent a message to my client and all teachers within this district that that type of conduct is okay in this district. If you are a supporter of Donald Trump and express that support, it's okay for a teacher to swear at you to say you're a bigot, you're filled with hate, and that if you don't stop, you have to have a union representative here with you because I'm going to investigate or fire you also. But it wasn't just that. It was you bring your representative and I'll bring mine. In other words, we have a disagreement here and we're going to see where this goes. I mean, there's no firing, there's no transfer, there's no nothing. So we have to go back to the basic principle. Would a reasonable person be deterred from going forward with the kind of speech he did, which was, I guess, wearing his hat in a parking lot? So do I, you know, I shouldn't be looking at is he going to be deterred from doing some other kinds of speech. He wasn't trying to do some others. So I'm looking, would a reasonable person in his position be deterred by those here to at least get to a level where it goes to a jury? Right? Or is it, does it fail as a matter of law? Right? I mean, we're not going on the, just on whether there's a case, not whether there's qualified immunity. Have I got this right? Am I doing it right? If I'm following you correctly, I think so. Okay. We definitely would start with the legal standard and look at those facts and say, based on that legal standard, could a jury so instructed apply it to these facts, viewing the light, the record of the light most favorable to my client and reach that conclusion? And we think that the answer is yes. And I would also point out that in the course of this back and forth with Principal Garrett, my client said, maybe can I transfer jobs? And she said, not in this school. So she, so Principal Garrett was using the employment setting as leverage to chill my client's speech. And would also point out that this court observed that adverse employment action isn't the same as adverse employment action in a pure employment context, you know, like hostile work environment claims and that sort of thing. Because the question is really about the speech, not about the employment. My real complaint isn't that you changed my employment conditions. My real complaint is that you infringed on my constitutional right. I see I have a couple minutes remaining. I was hoping to reserve some time for rebuttal, if I may. Can I just ask the question, what's your view about waiting for the Supreme Court or not on Boole? Am I saying it right, B-O-U-L-E? Because the Ninth Circuit has recognized a First Amendment Bivens action, and we don't have any word on that yet from the Supreme Court, right? I'm not familiar with that case, actually. If that's a Bivens case, it would suggest that that's probably a claim under Bivens against a, in a federal setting, whereas this is a state law setting under Section 1983. Okay, thank you. Good morning, Your Honor. May it please the Court, Amber Pierce for Appellee Caroline Garrett, the principal of the school, and I'm splitting time with my co-appellee for the school district, and Ms. Gomes. Your Honor, the first, first part of the analysis is was there a First Amendment retaliation claim that could be made, and we submit that there, that he cannot prove the retaliation claim, particularly the adverse employment action. Is your opposing counsel correct that his client asked if he could transfer or something like that? She said not in this school? That's incorrect. She said not, not as far as she knew, but that was not her, that was more of a human resources question, whether or not there was another position within the school. This is an HR question. I can't answer it? That was, that was the beginning of the conversation. She did say, I don't believe there's a position in this school to transfer to, as it, because he was a sixth grade science teacher, and so she wasn't sure if there was another position of that stature for him, so he... My impression was the context was sort of, no one will buy you lunch in this town. That was, that's not the inference that I believe could be true. So, how is this not an adverse action? As we've been talking about, our test is, is it reasonably likely to chill someone's speech? And I'm struggling with, I think maybe we're making it harder than it is. This is a case where a boss tells an employee, you can't do this again, and the thing that you can't do is speech. So this isn't reasonably likely to chill, this is prohibiting speech. How is this not an adverse action in the context of First Amendment? Well, Your Honor, respectfully, this is a situation where the school district has a lot of discretion and leeway under Brewster and also under Pickering to manage disruption in the school, and that's the bottom line, that's the threshold. So that's the Pickering test, but we're, we're, when we're at adverse employment action, we're before we get to the Pickering test, and we're just at the prima facie case, and we're trying to see if something adverse happened that was just, you know, you have a boss who's just ordering you. I mean, if we take the lights, the facts and the light most favorable to the plaintiff, which we have to do at this point, his boss told him, don't ever do that again. That's, that's, that's definitely chilling. It is in the context, it is in the context of the outside world, I think, in the terms of a school district and a setting where you need to avoid disruption, and there must be trust and respect among the teachers and students. That's different, and when he said employment in a, in a school district with the students, I think that's a different setting than being out in the world. And I'm, don't believe that Ms. Garrett had any sort of animus toward him. There's, he said, with respect to whether or not she had any tirade against him. We have to take his version at this point. Sure. But even if she did, the case law supports the fact that just mere threats and words are not enough. Right. Okay. I mean, so we have, there's two issues with that. One, the power dynamic of boss and employee, and if your boss tells you you're prohibited from doing this, doesn't that come with an inference of, if you choose to do it, there will be consequences, at the least of which you're going to be found insubordinate. And then two, we have the follow-on statement of, if you do, I mean, the sort of express articulation of, if this happens again, we're going to meet with our union reps, which is sort of a loaded statement, because you don't have a casual conversation with union reps present. Correct. So I guess I'm, I'm, I'm, I'm struggling to see how, whether an adverse employment action happened is a hard question here. Whether or not there was an adverse employment action? Correct. I don't believe there was an adverse employment action because the threat of a meeting with union reps never occurred. And her harsh words and threats were insufficient under Nunez versus City of Los Angeles to amount to an adverse employment action. And you're right. The clearly established aspect of this case, because that is a trickier question to me. We were talking about it a little bit with your adversary about our case law not being totally clear on just how much has to be out there in the law for something to be clearly established in this arena. So can you give us your sort of best take on that? It's a pretty, it's a pretty high threshold in terms of finding spot on cases. And courts have repeatedly said that in their, in their analysis. And that's why pickering and qualified immunity typically apply in way in favor of school employees and school districts. I don't know if that sufficiently answered your question. Our case law, I mean, existing case law does indicate that a school's interest is heightened when you have students and parents involved and you're in the actual setting of the operation of school, meaning instruction is happening. And that's not this case. So would you dispute that, that, that distinction between the sort of instructional setting where students are present and a setting like this case that is clearly established that the interests are different in those two contexts? I would say that they, they are not, that they are, they are the same. And there were students on campus that were Latino and Latina students taking classes. And there were also the minority children's parents that were also on campus at this time to see this hat coming and going inside the classroom. But even in a, even in the setting... There's nothing in the record about the hat coming and going to the classroom, is there? Yes, Your Honor. He brought the hat inside and set it on the table on his desk. Well, that wasn't with a student's classroom. That was the teacher conference. That's correct. And in the context of a teacher conference, even disruption there, wherein you have teachers who are minority teachers or a lot of Latino, Latina teachers, and they were concerned... Let me ask you this. I wonder about this policy. This policy allowed political speech, basically. And, but then it seemed like there was only one side's political speech was allowed. What are we doing with that? I mean, she's got the bumper sticker, Black Lives Matter, but no MAGA hats. So, I mean, at the first step, this seems a pretty good win for him. And then you get to the other steps. Because it seemed like a clear violation of the policy to only allow one side's political speech. Yeah, the policy specifically talks about that you can wear a pin or something, but you can't... As long as you avoid disruption. And so this means that even someone wearing Elizabeth Warren or Bernie Sanders sticker comes in or a pin and causes disruption, that also is a concern. So it's not a partisan issue. It's whatever is causing disruption in the schoolroom where you need trust, not only among the students, but also with the teachers and communication and respect. On the second occasion, did he wear the hat in the room where this training was going on? No, I believe he took it off and put it on the desk. And then as he was leaving the room, as he was getting up from his desk, he put it back on his head and walked in front of the professor that was there to teach the cultural inclusivity. Would your analysis of the situation be any different if he had simply worn a MAGA pin on his lapel? No, Your Honor, the threshold is disruption and heightened leeway for the administrators to maintain a positive and peaceful learning... So in your view, Mr. Dodge had no First Amendment right to wear that hat in the parking lot? I think that under the school policy, he did. If there are people, if there are schools, I mean, excuse me, if there are cars that can have bumper stickers on out in the parking lot, then yeah, he could wear it out in the parking lot. Okay, I understand your position. Thank you. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. Mick McFarland on behalf of Janae Gomes and Evergreen Public Schools. I'm going to jump around a little bit and try to answer some of the questions that the Court asked other counsel. First and foremost, I think the question... Speak up. My apologies. First and foremost, the first question was, where's the discriminatory animus? And I do think it's important in this case, because I represent Janae Gomes and not Carolyn Garrett, to note that Mr. Dodge has argued throughout this case that the discriminatory animus allegedly that Ms. Garrett has in being a Bernie Sanders supporter and having a Black Lives Matter... We're not going to resolve that here, and we have to take his complaint as true. Sure. But what is undisputed in the case, Your Honor, is that Carolyn Garrett, or excuse me, Janae Gomes does not have that same political ideology as does Ms. Garrett. Good. Understood. One of the next questions that was he gave you two answers. One, he talked about the vulgarities and the threats that Ms. Garrett used, which of course is not related to my clients. The second adverse employment action he noted was the investigation. And of course, my client, Janae Gomes, did head up that investigation. But a couple of things are important to keep in mind. Number one, the investigation was a complaint lodged by Mr. Dodge. The end result of that investigation was a finding that Mr. Dodge did not violate any policy or procedure of Evergreen Public Schools. Number two, and to go back to a question I think that Your Honor asked, Mr. Dodge actually asked to be transferred to a different school by Ms. Gomes was to allow him to transfer to a different school. That then subsequently was upheld by the board. The third thing that the investigation concluded or my client's investigation concluded was that there would be no adverse employment action taken against Mr. Dodge as a result of the underlying incidents and from filing a harassment, intimidation, and bullying complaint. And then finally, as part of that investigation, Ms. Gomes concluded or held and disclosed to Mr. Dodge that the school district would be providing training to, quote, all employees on freedom of expression. So to answer the question of whether there's an adverse employment action, I don't believe there was because as at least it there was nothing that Ms. Gomes or Evergreen Public Schools did that would in any way chill Mr. Dodge's rights or first expression rights. And Evergreen Public Schools. And of course, of course, the claim against Evergreen Public Schools is that it ratified an unconstitutional decision. And of course, our position is there wasn't an underlying constitutional violation. But secondly, as it relates to the Monell claim against the school district, the actual decision was to uphold those four findings that I just ran through with you that Ms. Gomes concluded at the end of her investigation. And as your honor pointed out, in addition to that, there was concern by the board that Ms. Gomes, although excuse me, Ms. Garrett, although not necessarily having violated any school policy that she may nonetheless have not acted in a professional manner and the actual discipline that was issued by the board was giving Ms. Gomes or Ms. Garrett the option of either resigning from her position or being demoted to an assistant principal position. So I think there's some element of imputing to Ms. Gomes, Ms. Garrett's behavior because Ms. Gomes approved of her meeting with Mr. Dodge and seems to be some allegation that she encouraged the shutting down of his speech. What happened is on the first occasion that Ms. Garrett called Ms. Gomes, Ms. Gomes said, talk to Mr. Dodge about how his hat is affecting the other teachers. Then on the second occasion, the following day when Mr. Dodge, and he did bring his hat from the parking lot, your honor, brought it to the door of the building, took it off, carried it into the training on the leaving the building. And I've diverted from your question, but I think that's an important distinction because we're not dealing with a difference of how employees are treated based upon what might've happened in the parking lot or what might've happened on their own private time. We're dealing with a very limited situation of whether there's a disruption inside the school engaged in... Isn't this sort of underlying theme of your client saying to Ms. Garrett, talk to him about this, a feeling that there was something wrong about what Mr. Dodge did? I don't believe so, your honor, because again, and this will go back to your question, your honor. Same question. Yes, because it was the second day and on the second day when Ms. Garrett called Ms. Gomes, Ms. Gomes did respond, tell him not to wear the hat in training sessions. And I submit that number one, that's not an adverse employment action. It might be a prior restraint, but a prior restraint claim wasn't brought in this situation. And number two, I don't believe that Mr. Dodge wearing the MAGA hat in a cultural sensitivity training is in the first place a protected speech because what the cases all talk about as far as the protected speech they look at, does it have to do with the public evaluation of the government or does it contribute to the public political discourse? And that's why we look at the context form and content to determine whether the speech was protected in the first place. And in this case, we're dealing with a gentleman who said he didn't, he wasn't trying to communicate anything. We have a very narrow audience, the participants in the training, which the case law says is relevant for determining whether it was a matter of public concern. Mixed facts on whether he was trying to communicate anything. Didn't he want to wear his hat to provoke conversation? I thought he said that. He said that in general. And he said that on the day in question, he wore it simply to protect against the sunspots. But he did then in a subsequent declaration say, I also wear it because I want people to know who I am. And my position on that is the latter, who Mr. Dodge is and what his personal beliefs are in the context of wearing a hat to a cultural sensitivity training is not a matter of public concern. It's personal to Mr. Dodge. I don't know what to do with that argument. To have a court say that demonstrate or sharing a presidential slogan is not a matter of public concern under the First Amendment seems entirely contrary to the First Amendment, which the bedrock principle of the First Amendment is political speech. Sure, Your Honor. And the word you used, and I will agree with your assessment there, is a protester. This wasn't a protester. So only protesters get political speech? No. But one of the things that the case law holds is that in looking at the context, content, and form of where the speech is, what is the plaintiff's or the speaker's motivation, number one? And number two, what's the audience that the speech is made to? And three, what is the intent, I guess I said that already, of the speaker? And in that context, when you're dealing with someone acting in their employment situation as a public employee at school, I would submit that if he was wearing a shirt that had just a vulgarity on it and was told you can't wear that in school because it causes disruption, that's not a First Amendment violation. And similarly, just because he's got a MAGA hat on, that he's not intending to... That argument would make sense if the policy of the school was no political speech across the board. But if you're going to allow some political speech in that setting, your argument doesn't make any sense. First of all, the policy of the school district regarding First Amendment, I think, was adopted after this event and probably in response to this event. So I think more particularly, you're talking about the practice in the school itself and specifically what Ms. Garrett allows or doesn't allow. And as it relates to that, and as counsel referenced earlier, it's not the content of the speech itself, it's what effect that speech has. No, but you get the impression, the overall impression at least that I get from this case is if Mr. Dodge had worn a Joe Biden hat, none of this would have happened. That is a question I can't answer because I don't represent Ms. Garrett and I don't know what the reaction to anyone in that classroom or that training would have been. If there had been disruption and teachers crying and coming to Ms. Garrett and she had called Ms. Gomes, I would submit, we don't know, but I would submit the same result would ensue because it's the disruption that is the key. But of course the Supreme Court for a very long time has recognized that there can be speech about controversial topics that inherently involve some disruption because people disagree and yet the First Amendment still applies. And I'm thinking specifically of the Tinker case and the Vietnam War comments made in a school context, right? So just because you can stand up and say somebody didn't like this, it's disruptive to them, is not determinative of whether the First Amendment applies or not. Maybe that's when the First Amendment needs to apply the most. And I think that gets into the second aspect of why I think we're here today on the qualified immunity. Because if I am wrong, if it was protected speech, then you go into the Pickering balancing test and weigh those by the court. Does there have to be a fact-specific case that has the exact same factual scenario? No. But what the cases do say and have said as recently as last month in the Riley versus Sasser, the Riley case from last month, if you have to go into the balancing test, it doesn't have to be an exact case on point. But if you're looking at a government official that has these facts before them and is trying to weigh this, rarely are you ever going to find a situation where it's so patently unreasonable for those people to conclude that they had the right to, in this very narrow, limited circumstance, tell someone he couldn't wear a hat. All right. We've taken way over time. Any more questions? Thank you for your argument. Thank you. All right. We'll put two and a half minutes on the clock, give you a little bit of a chance to rebut. This is that case. It was patently unreasonable. In addition to that test, which is one of the two that this court may use to evaluate whether qualified immunity is available under Pickering balancing, there are several specific cases that put these defendants on notice as well. We'd point to this court's decision in Settlegood where there was similar expressions about hurt feelings from teachers. I feel surprised. I don't think I can trust this, my colleague anymore, that hurt me. And this court said that that's not sufficient under Pickering balancing because as you pointed out, Judge Forrest, the First Amendment exists to protect unpopular speech. We don't need the First Amendment to protect speech that everyone likes because there's not going to be any problem with it. The First Amendment protects unpopular speech that other people are going to dislike. So this court has repeatedly recognized. And it would point out in Settlegood, in Pickering itself, it says that speech can cause anger. So that speech is necessarily going to cause some disruption. So the question is, do you have evidence of disruption beyond that? And here we just don't because apart from all of the exaggerations of the record, at this training, all of the witnesses said there was no disruption. Principal Garrett herself was there. Ms. Matsumoto, one of the might have a different case. If he had paraded around the room, if he had interrupted the trainer, if he had waved his hat about, something like that, and had truly prevented the training from happening. That's just not this case. And instead, what Settlegood tells us is when it's just mere hurt feelings, you don't get qualified immunity. And Settlegood also pointed out that the speech there had a positive benefit because it encouraged teachers to come together and solve the problem. Well, that's what we have here. We have a problem with respecting the First Amendment in this school district and in this building. And the positive effects were twofold. The training that the district just described district wide to talk about the importance of free expression. And also, Ms. Garrett no longer has a job. So we believe that this free speech had this positive benefit and under Settlegood, that's an additional reason to find no reasonable official would find that Pickering balancing favored the suppression of speech. I see that I'm out of time unless anyone had any more questions. I thank the court for their time and we rest on our breath. All right. Thank you, counsel, for your helpful arguments. The case of Dodge versus Evergreen School District is submitted.
judges: HAWKINS, FORREST, Restani